UNITED STATES DISTRICT COURT FILED
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION
98 DEC 23 AM 9:54

U.S. DISTRICT COURT
N.D. OF ALABAMA

MATTIE CLAY,     ]
     ]
   Plaintiff(s),    ]
     ]
vs.     ]    CV 97-N-2152-W
     ]
FOREST MANOR NURSING HOME,   ]
     ]
   Defendant(s).    ]

ENTERED

DEC 23 1998

## MEMORANDUM OF OPINION

### I.   INTRODUCTION.

In this employment discrimination case, the plaintiff, Mattie Clay ("Clay"), brings suit against her former employer, Forest Manor, Inc.[1] ("Forest Manor"), alleging discrimination on the basis of race and retaliation and seeking a remedy under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). The matter is presently before the court on the defendant's motion for summary judgment, filed July 10, 1998.[2] The motion has been fully briefed and is ripe for decision. Upon due consideration, it will be granted in part and denied in part.

---

[1] The complaint incorrectly designated this entity as Forest Manor Nursing Home.

[2] In a related matter, the court has for consideration defendants' motion to strike, filed August 13, 1998, in which the defendants have moved to strike portions of a number of affidavits of Forest Manor employees which plaintiff submitted in support of her opposition to summary judgment. The court will consider this matter contemporaneously with the motion for summary judgment and will disregard any portions of the affidavits not properly before the court on summary judgment.

## II.    STATEMENT OF FACTS.[3]

### A.    THE EVENTS LEADING TO MS. CLAY'S TERMINATION

The undisputed facts reveal that Forest Manor operates a nursing home for the elderly in Northport, Alabama. Mattie Clay, a black female, was hired on May 25, 1995, to work as a Certified Nursing Assistant ("CNA"). As a CNA, Ms. Clay was responsible for the daily care and needs of the elderly patients to whom she was assigned.

Eight disciplinary warnings regarding Ms. Clay were issued during her approximately eleven months of employment at Forest Manor. She also received one three day suspension, and was ultimately terminated. Forest Manor contends that it terminated Ms. Clay because of her repeated disciplinary problems.

As the exact nature and timing of the warnings issued may be important to the outcome of defendant's motion, the court will review them. First, however, a description of Forest Manor's disciplinary policy will be useful in understanding the sequence of events leading up to the plaintiff's termination. Both parties agree that Forest Manor generally follows a progressive discipline policy.[4] Discipline under the policy proceeds in four stages. An employee is first verbally warned about an infraction of the rules. This event is often recorded in writing. If the same or a similar violation occurs again, the employee receives a formal written warning.  The next violation merits suspension, and any

---

[3] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[4] There appears to be a dispute over whether a formal written discipline policy was in effect at the times relevant to this litigation, but the parties agree on the basic content of the discipline policy, whether written or informal.

subsequent violation results in termination. However, this framework is not rigid. A particularly severe offense or one which is very similar to past offenses may result in a more rapid escalation of discipline, while a minor or different offense may lead the decisionmakers to give the employee extra chances. *See, e.g., Plaintiff's Exhibit 4 (Depo. of Susan Williams at 55-58); Plaintiff's Exhibit 3 (Depo. of Seleter Cooper at 36).*

Forest Manor's policy also imposed technical requirements on the warnings given. They were supposed to be signed by an issuing supervisor, discussed with the employee, and either signed by that employee or marked with a notation that the employee refused to sign. Additionally, the forms used provided spaces for the supervisor to indicate whether the warning was verbal or was considered a formal written warning within the progressive discipline scheme.

Ms. Clay's file contains eight separate disciplinary warnings. However, her disciplinary record is complicated by the fact that the supervisors who issued these warnings did not comply with Forest Manor's procedures particularly well. Several of the warnings do not contain the name or signature of a supervisor. Only a few indicate whether they were intended to be written or verbal warnings. Only two bear Ms. Clay's signature or a notation that she refused to sign. In fact, while there is some dispute about whether each violation was brought to Ms. Clay's attention at the time it happened, her undisputed testimony indicates that she was told that she was actually being written up during only one of the remaining incidents. *See Movant's Response to Opponent's Statement of Facts* Nos. 53-54.

3

With those problems in mind, the court will briefly review the specifics of each warning. Ms. Clay was verbally counseled for improper use of patient restraints on July 11, 1995. She signed the resulting verbal warning notice. *See Plaintiff's Exhibit 18.* On August 16, 1995 Ms. Clay was given a verbal warning for "not following directions of [her] supervisor." The warning indicates that Ms. Clay did not "bathe [patient] Ms. Pearson before she went to lunch" and did not "swap lunch times" as she was told to do. The issuing supervisor noted that Clay was presented with the warning but refused to sign it. *See Plaintiff's Exhibit 19.*

On December 24, 1996, an employee warning notice was issued stating that Ms. Clay's patient "Dovie Jones [was] not fed lunch" and "her 10 a.m. and 2 p.m. snacks were found in the garbage."[5] The parties dispute the facts underlying this disciplinary action, as Ms. Clay claims that she did nothing wrong.[6] It is not clear who issued the warning, though Clay's supervisor Jennifer Elmore signed the notice as a witness, *see Plaintiff's Exhibit 21*, and it appears that the notice was probably issued by her. *See Plaintiff's Exhibit 3 (Depo. of Seleter Cooper at 52).* The warning does not indicate whether is was intended to be written or verbal. *See Plaintiff's Exhibits 20 and 21.*

On January 29, 1996, Jennifer Elmore issued another employee counseling record about Ms. Clay, based on Ms. Elmore's observation that Ms. Clay had caused a "disruption

---

[5] There are actually two written documents in the record relating to this one incident.

[6] Ms. Elmore testified that she was first alerted to a potential problem by the CNA who fed Ms. Jones' roommate. This CNA informed Ms. Elmore that Ms. Clay had not fed Ms. Jones. Upon hearing this, Ms. Elmore claims that she investigated the report and found there was no evidence that Ms. Jones had been fed, that Ms. Jones' lunch tray was still on the feeders car, and that her snack was in the garbage. *Plaintiff's Exhibit 5 (Depo. of Jennifer Elmore at* 34-36, 54-55). Clay disputes these claims, and testified that she fed Ms. Jones and did not throw any food away. *Plaintiff's Exhibit 1( Depo. of Mattie Clay at* 34-40).

of work flow and staff." Specifically, the counseling record states that Ms. Clay had an "argument [with] the bath team," as well as an argument with an African-American CNA, Wanda Sims. *Plaintiff's Exhibit 22.* Once again, Ms. Clay's version of events is different from that advanced by Forest Manor.

Ms. Clay received two further warnings on January 30, 1996. Both were issued by Kristal Taylor, a Licensed Professional Nurse (LPN) who sometimes supervised Clay. Neither indicated whether the warning given was intended to be verbal or written.

The first warning states that Ms. Taylor told Ms. Clay that "a resident was going to be [Ms. Clay's] to feed . . . [but] at 9:45 a.m. [the] resident still had not been fed breakfast," and when Ms. Taylor informed Ms. Clay the resident had not been fed, Ms. Clay "began arguing with" Ms. Taylor. *Plaintiff's Exhibit 23.* The second warning states that Mr. Brown, a resident, "was left on his back gasping for air" and that "a.m. [morning] care had not been done on this resident and the time was 12:00 noon." *Defendant's Exhibit 3 (Aff. of Kristal Taylor, Ex. B).* According to Ms. Taylor, she had previously instructed Ms. Clay that the resident, Mr. Brown, was never to be on his back. *Defendant's Exhibit 3 (Aff. of Kristal Taylor ¶11).* Additionally, Mr. Brown's "linen under him had dried [with feces] on it, dried saliva was noted [on Mr. Brown's] face, [he] had not been shaved, [and] had an odor to him." *Id.* ¶14. Ms. Clay claims that she was not aware of *any* incident with Mr. Brown.

In February of 1996, a new Registered Nurse (RN), Leila Quizon, took over supervision of Ms. Clay's unit. Quizon became aware that Mattie Clay had been written up on several occasions for poor patient care and/or insubordination. On February 27, 1996, Leila Quizon informed Ms. Clay that because of the accumulated complaints she was

suspended for 3 days. Ms. Quizon pointed in particular to the three write-ups of January 29 and 30 as grounds for the suspension. *See Plaintiff's Exhibit 3 (Depo. of Seleter Cooper at 68)*. Forest Manor's Director of Nursing, Seleter Cooper, was also present at this meeting.

Ms. Clay received yet another warning on April 19, 1998, after she returned from her suspension. Forest Manor's Quality Assurance Coordinator Priscilla Burt issued a written policy violation concerning Ms. Clay. Ms. Burt noted that Ms. Clay had violated policy by "wearing gloves in [the] hall" and "carrying soiled linen and clean clothes down the hall at the same time." *Defendant's Exhibit 1 (Aff. of Susan Williams, Ex. A)*. This conduct poses a potential infection risk. However, Quizon and Cooper, the supervisors responsible for disciplining Clay, were not aware that this warning had been issued.

Ms. Clay's final warning came on April 27, 1998. On this date Ms. Elmore issued yet another warning to Ms. Clay. The notice stated that Clay was asked to "transfer [a resident, Mr. Beauchamp,] to feeding group," and that upon being asked Ms. Clay "argued" and "walked away." Furthermore, Ms. Elmore noted that Ms. Clay "has to be reminded daily to do snacks and daily responsibilit[ies] and has a total lack of respect for supervisors." *Plaintiff's Exhibit 25; Defendant's Exhibit 1 (Aff. of Susan Williams, Ex. A)*. Elmore also noted that Clay had previously been warned and suspended, and the warning form Elmore filled out has a check by the box marked "Dismissal," which Elmore testified she put there. *See Plaintiff's Exhibit 5 (Depo. of Jennifer Elmore at 85)*.

Clay again puts forward a different version of the events leading up to this warning. In fact, she put her version down on paper in the form of a complaint about Ms. Elmore's allegedly unfair treatment. The letter, written the next day, reads as follows:

6

Jennifer Elmore asked me to turn on my call light. I came up the hall and came to [sic] desk to see what she wanted. Jennifer then went to hallowing [sic] and stomping her feet at me like I was her child. Jennifer say [sic] I have to tell you everyday to take Mr. Beauchamp to [sic] Dining room. Mr. Beauchamp was already in the Dining room. Jennifer was not telling the truth, she never said anything to me about Mr. Beauchamp anyway.    Mr. Beauchamp was not Jennifer's patient anyway.  Wanda in rehab was taking Mr. Beauchamp to the Dining room and Jennifer told Wanda not to take Mr. Beauchamp to the Dining room to let me take him to have something to fuss with me about.  I was down the hall busy cleaning up a patient and she calling [sic] me on the call light and Mr. Beauchamp was already in the Dining room.

Jennifer Elmore does not know how to talk to anybody. Her attitude is out of this world.  Jennifer has had it with several CNA's.  The following will witness for me.   Cindy Casey, Mary Thomas. Willie Ann, Tina, LaQuitha, Tracy, Belinda.

Mr. Beauchamp was in the Dining room when Jennifer started this mess, she just did it to have something to get at me about.  Jennifer is always picking at me the witness [sic] I have several people witness for me.

One time before Jennifer came in the room hollowing [sic] at me saying Mr. Brown is on the rail and he hadn't been turned all day.  She was not telling the truth about this because Martha Kemp had helped me to turn Mr. Brown.  Martha can witness to that.  Jennifer did not apologize for that.

I am not a child, in fact, I am older than Jennifer and she need [sic] to learn how to talk to people. *Just because I am black that don't [sic] mean she have to talk to me like a dog.*  Matter of fact, you don't talk to a dog the way she be [sic] talking to me.  She telling [sic] me to hit the clock and all of that.

Remember to do unto others as you would have them to do unto you.

Jennifer Elmore is an [sic] LPN and she need [sic] to have the ability to get along with others and change her attitude. *She do [sic] wrong and then she be [sic] running up in black folk face grinning about it.*

Tracy Taylor and others say Jennifer made the statement she should hit me.

*Plaintiff's Exhibit 17 (emphasis added).*  To bolster her version of events, the plaintiff advances affidavits from several black Forest Manor employees who offer their opinions

that Elmore frequently treated employees rudely, and was generally more disrespectful to blacks than whites. *See Plaintiff's Exhibits 6-11.*[7]

The parties agree that nothing further happened on either the twenty-seventh or the twenty-eighth of April. Because the twenty-seventh was a Saturday, Elmore apparently had the authority to suspend Ms. Clay on her own authority until higher management returned to deal with the problem on Monday. She chose not to do so, however. Ms. Clay worked her full shift on both days.

Ms. Cooper, the Director of Nursing, was off for the weekend. She did not find out about the new disciplinary warning until she returned to work on Monday, April 29. Exactly what happened on the twenty-ninth is a matter of hot dispute between the parties. However, viewed in the light most favorable to the plaintiff and taking her version of events as true, things happened something like this. When Clay arrived in the morning, she gave her letter about Elmore to Cooper and Susan Williams, Forest Manor's Administrator. They referred her to Sandy Brown, then the RN in charge of Ms. Clay's unit. Clay described her meeting with Brown as follows:

> She [Brown] got it [the Elmore letter] and read it and she started reading it and when she got to the word "black", she started hollering, and [said] ["]it's not the color of your skin.["] I said[, "Y]es it is.["] Then I say[, "]I see you hollering. I see you

---

[7] Forest Manor claims that these remarks should be stricken from the record because they contain conclusory allegations of prejudice. Generalized allegations of racism are due to be stricken. *See Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 & n.6 (11th Cir. 1998). However, the court finds that the allegations contained in these affidavits do not fall into this category. They make a specific claim - that Ms. Elmore yelled more at blacks than whites - which could be, and allegedly is, based on personal observation. Having worked with Elmore, the affiants could be expected to have some knowledge of the way she treated various individuals. Their averments, though made in the form of opinions, are thus based on "observation and other grounds of personal knowledge," *Visser v. Packer Engineering Associates, Inc.*, 924 F.2d 655, 660 (7th Cir. 1991), are not due to be stricken, and may be considered for what they are worth.

> don't know how to talk to people either." I said[, "G]ive me my
> paper back so I can take it back to Ms. Cooper.["]

*See Plaintiff's Exhibit 3 (Depo. of Mattie Clay at* 91). Ms. Clay then took the letter back to

Ms. Cooper. All of this transpired around 9:00 A.M. The prospect of termination was not

mentioned during any of these conversations, and in fact Ms. Clay claims that she was

unaware at the time that she had even been written up. *Opponents Statement of Facts* Nos.

57, 60-61, 77; *Plaintiff's Exhibit 3 (Depo. of Mattie Clay at* 165).

Early on the same day, Ms. Cooper received word of the warning which Ms. Elmore

had issued to the plaintiff. She met with Brown, Quizon, and Elmore, before reaching the

decision "sometime during the day" to terminate the plaintiff *Plaintiff's Exhibit 3 (Depo. of

Seleter Cooper at* 80, 100-101). Late that afternoon, at the end of Ms. Clay's shift, Ms.

Cooper and Ms. Brown pulled the plaintiff aside and informed her that she was terminated

because she had received another warning after being suspended. Cooper contends that

she waited until the end of the shift so that Ms. Clay could catch her usual ride home with

another worker at the end of the shift, and that Ms. Clay's letter about Elmore played no part

in the termination decision. *See Plaintiff's Exhibit 3 (Depo. of Seleter Cooper at* 52). The

plaintiff contends that Ms. Cooper made this critical decision only after she received the

letter, and that the letter spurred her decision.

9

## B.    THE COMPARATORS

Both parties compare Ms. Clay's treatment to that afforded three white employees who were terminated by Forest Manor at about the same time.[8]  Some background on the employment history of these three women will therefore be necessary to evaluate the plaintiff's claims.

### 1.    EMILY SWANSON

Emily Swanson, a white CNA, began working at Forest Manor on June 19, 1995. Ms. Swanson was the subject of seven disciplinary actions during her time at Forest Manor. The first was issued by LPN Lisa Hendrix on September 6, 1995 for changing a male patient with the door and curtain left open. *Defendant's Exhibit 1 (Aff. of Susan Williams, Ex. D)*. This notice does not say whether it was intended as a verbal or a written warning. The second was a written warning issued on October 25, 1995 for "filling out safety check sheets before [the] actual time [they] were signed for." Ms. Swanson then received three warning notices, one oral, two written, on March 20, 1996, for unsatisfactory work product and failure to follow instructions. *Defendant's Exhibit 1 (Aff. of Susan Williams, Ex. D)*. The two written warnings were issued by Ms. Cooper, and both cited infractions which had occurred several days previously. The verbal warning was issued by LPN Sonia Ryan late the same

---

[8]In their briefs, the parties have engaged in an odd squabble over who the comparators are. The plaintiff's brief claims that "Forest Manor contends that the 'comparators' in this case are Tracy Taylor, Emily Swanson, and Kemm Henley," *Opponent's Responsive Submission in Response to Exhibit D of the Court's Order at* 19, before going on to discuss these three women as comparators. The court shares the defendant's difficulty in understanding this statement, as it is typically the plaintiff who comes forward with comparators. Perhaps it is simply a mistake. In any event, a review of the record indicates that it contains substantial evidence on the treatment of these three individuals, and virtually no evidence on the treatment of any other white employees. Plaintiff has not argued that anyone else is similarly situated, and the record contains no evidence to support such a claim if it were made. Thus plaintiff's case must stand or fall on these three.

day. *See Defendant's Exhibit 1 (Aff. of Susan Williams, Ex. D)*. Cooper was unaware that this warning had been issued, and no further action was taken on that day.

Two days later, on March 22, 1996, Ms. Swanson was issued a three day suspension by LPN Debbie Kilgore for unsatisfactory work quality, specifically for failing to change a patient. *Defendant's Exhibit 1 (Aff. of Susan Williams, Ex. D)*. After returning from her three day suspension, Ms. Swanson received another warning, issued on March 30, 1996. The warning recommended termination and was issued due to unsatisfactory work quality and failure to follow instructions. Ms. Swanson had apparently failed to keep one of her patients bathed and clean. *Defendant's Exhibit 1 (Aff. of Susan Williams, Ex. D)*. As a result of this warning and Ms. Swanson's history of poor performance, Ms. Swanson was terminated by Seleter Cooper on April 2, 1996, for "poor care" and "unsatisfactory work performance." *Defendant's Exhibit 1 (Aff. of Susan Williams, Ex. D)*. Cooper admitted that Swanson was "possibly" given more opportunities to correct her behavior than Clay before being terminated. *Plaintiff's Exhibit 3 (Depo. of Seleter Cooper at 142)*.

### 2. TRACY TAYLOR

Tracy Taylor, a white CNA, worked at Forest Manor at the same time as the plaintiff. Ms. Taylor had a number of unexcused absences on her record, and was issued a verbal warning regarding absences on September 25, 1995. She did not call in or show up for work two days later, on September 27, and there is some evidence that under Forest Manor's policy she should have been terminated under the nursing home's "no call no show" policy. *Plaintiff's Exhibit 4 (Depo. of Susan Williams at 164-66)*. She was not, however.

11

On April 27, 1996, Ms. Taylor received a written employee warning notice, issued by Jennifer Elmore, for "rudeness," "carelessness" and "unsatisfactory work quality." Specifically, Taylor was cited for leaving a patient "soaking wet" and for moving the patient's call light out of reach. *Defendant's Exhibit 1 (Aff. of Susan Williams, Ex. C)*. Seleter Cooper indicated on this report that "should [Ms. Taylor] have another write up [she would] be given a 3 day suspension." *Id.* Ms. Taylor had never before been issued a verbal or written warning concerning poor patient care or poor work quality. At the time, Ms. Cooper was not aware that Ms. Taylor had been warned regarding attendance, and no further action was taken.

On May 10, 1996 Ms. Taylor again missed work without calling in. She was terminated by Seleter Cooper on May 13 for violation of Forest Manor's "no call no show" policy.[9]

### 3.   *KEMM HENLEY*

Kemm Henley, who is Caucasian, was an LPN at Forest Manor from January 12, 1995, until her termination on February 21, 1996. Ms. Henley's tenure at Forest Manor was marred by disciplinary problems. She received four medication error reports in 1995, along with an insufficient charting report. She also received four employee warning notices during the same period. The first came on March 23, 1995. On that date, Ms. Henley received a written

---

[9]Plaintiff argues that Ms. Taylor effectively quit her job because she failed to show up, so that this should not be treated as an actual termination by Forest Manor. Plaintiff bases this argument not on the factual circumstances surrounding Ms. Taylor's absence, but on the testimony of Ms. Williams, the Forest Manor Administrator, who said in explaining the home's "no call no show" policy that failure to show up without a reason was "job abandonment." *Plaintiff's Exhibit 4 (Depo. of Susan Williams at 76)*. Without some evidence that Ms. Taylor in fact intended to quit, the court finds this argument, based only on a statement by Williams which is being applied out of context, highly questionable. In any event, as the discussion below reveals, whether Ms. Taylor was fired or just quit is immaterial.

warning for failure to notice that a patient's urine output had dropped dangerously low, thus posing a health risk to the patient. On April 11, 1995, Ms. Henley was issued a warning for improper charting. She also received two warnings regarding absences. *Defendant's Exhibit 1 (Aff. of Susan Williams, Ex. E)*.

Ms. Henley was terminated by Ms. Cooper on February 21, 1996, for falsifying medication records. The parties agree that prior to this point Ms. Cooper was unaware of the warnings which had been issued to Ms. Henley. *Opponent's Response to Movant's Statement of Facts* No. 83.

## III.   SUMMARY JUDGMENT STANDARD.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Where the nonmoving party will bear the burden of proof at trial, there is no requirement, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Celotex*, 477 U.S. at 323. "Instead, the moving party simply may '"show[ ]"'--that is, point[ ] out to the district court--that there is an

absence of evidence to support the nonmoving party's case.'" *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437-38 (11th Cir.1991) (*en banc*) (quoting *Celotex*, 477 U.S. at 324); *see also Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (same); *Young v. City of Augusta*, 59 F.3d 1160, 1170 (11th Cir. 1995). However, "it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Clark v. Coats and Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The moving party must instead make an "affirmative showing" that crucial evidence is missing "by reference to any combination of the following: pleadings; deposition testimony of a party or its witnesses; affidavits; responses to interrogatories . . . ; requests for admission . . . ; and any other exchanges between the parties that are in the record." *Cheatwood v. Roanoke Industries*, 891 F. Supp. 1528, 1533 (N.D. Ala. 1995) (Hancock, J.).

"Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial. If the moving party shows the absence of a triable issue of fact by either method, the burden on summary judgment shifts to the nonmoving party, who must show that a genuine issue remains for trial." *Four Parcels of Real Property*, 941 F.2d at 1437-38 (11th Cir.1991).

At this stage, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, she may not merely rest on

14

her pleadings. *Id.* at 324. The nonmoving party must make a specific, affirmative showing that a genuine factual dispute exists. If the required showing is not made, "summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. P. 56(e). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

After the plaintiff has responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11 (1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the

15

evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## IV.    THE MCDONNELL DOUGLAS FRAMEWORK

This case involves the application of Title VII of the Civil Rights Act to claims of racial discrimination and retaliation. Plaintiff seeks to establish both types of claims based on circumstantial evidence, so the familiar framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) governs this court's inquiry.

Under the *McDonnell Douglas* framework, a plaintiff seeking to establish a claim based on circumstantial evidence has the burden of establishing a *prima facie* case of discrimination or retaliation. "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). The burden of production then shifts to the defendant, requiring the defendant to articulate some "legitimate,

16

nondiscriminatory reason" for the allegedly discriminatory employment action. *Id.* "[I]t is possible for the defendant to present such strong evidence of a nondiscriminatory rationale that summary judgment is warranted." *Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946, 950 (11th Cir. 1991), *cert. denied*, 502 U.S. 1058 (1992) (quoting *Grigsby v. Reynolds Metal Co.*, 821 F.2d 590, 596 (11th Cir. 1987)).

Once the defendant presents a legitimate, nondiscriminatory reason for its action, the presumption of discrimination "drops from the case." *Burdine*, 450 U.S. at 255 & n.10. The plaintiff must then prove by a preponderance of the evidence that the reason offered by the defendant was not the true reason for the employment decision, but rather is a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804. "[B]ecause the plaintiff bears the burden of establishing pretext [for discrimination], he must present 'significantly probative' evidence on the issue to avoid summary judgment." *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 444 (11th Cir. 1996) (quoting *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988), *cert. denied*, 488 U.S. 1004 (1989)) (other citations omitted) (alterations in original).

The plaintiff may prove that the defendant intentionally discriminated against him "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989) (quoting *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1445 (11th Cir.), *cert. denied*, 474 U.S. 1005 (1985)). However, "'to withstand a defendant's motion for summary judgment, a plaintiff has to do more than establish a prima facie case and deny the credibility of defendant's witnesses.'"

*Howard v. BP Oil Co.*, 32 F.3d 520 (11th Cir. 1994) (quoting *Brown*, 939 F.2d at 950).

"Conclusory allegations of discrimination, without more, are not sufficient to raise an

inference of pretext or intentional discrimination where [a defendant] has offered extensive

evidence of legitimate, nondiscriminatory reasons for its actions." *Isenbergh*, 97 F.3d at 444

(quoting *Young*, 840 F.2d at 830). Plaintiff must instead "produc[e] sufficient evidence to

allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its

decision are not believable."[10] *Howard*, 32 F.3d at 526.

    If a plaintiff succeeds in this burden, the "disbelief of the defendant's proffered

reasons, together with the *prima facie* case, is sufficient circumstantial evidence to support

a finding of discrimination" and to preclude summary judgment. *Combs v. Plantation

Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997). Because of the difficult factual questions

involved in assessing "an employer's true motivations," once the plaintiff has presented

evidence raising a question about those motivations summary judgment is ordinarily

inappropriate. *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993).

If evidence in the record "demonstrate[s] 'such weaknesses, implausibilities,

inconsistencies, incoherencies or contradictions in the employer's preferred legitimate

reasons for its action that a legitimate factfinder could find them unworthy of credence,'"

the final assessment of the employer's motivation must be left to the jury. *Combs*, 106 F.3d

at 1538.

---

[10] In other words, a defendant can carry its initial burden on summary judgment on the pretext issue by presenting extensive proof to support its legitimate nondiscriminatory reason. If the defendant can show that its preferred reason was the real reason, it need not prove a negative by showing that the plaintiff cannot prove pretext. Pretext and a legitimate reason are, after all, two sides of the same coin. Proof of one disproves the other.

## V.    DISCUSSION.

### A.    Racial Discrimination.

Title VII of the Civil Rights Act provides, in part, that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). In order to prevail on a claim of race discrimination under Title VII, the plaintiff must prove that Forest Manor acted with a discriminatory purpose,[11] and that this purpose affected the terms and conditions of her employment. *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984).   To make out her *prima facie* case Ms. Clay must first identify specific actions by Forest Manor which affected the terms and conditions of her employment, and then match these actions with "facts adequate to permit an inference of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). What these facts are depends on the circumstances, so that the *prima facie* case concept is flexible and the elements may vary slightly from case to case. Generally, however, to make out a claim of race discrimination, the plaintiff must show that she was not treated in the same way as other employees of different races.

In this case, Ms. Clay asserts that Forest Manor discriminated against her by disciplining and then firing her.[12]   To prevail on her claims of discriminatory discipline and

---

[11]Where an entity like Forest Manor is concerned, this means that an agent of Forest Manor acted with discriminatory intent under circumstances in which Forest Manor can be held responsible for that agent's conduct.

[12]The complaint also contained a claim of discrimination based on job assignments. As defendant points out, there is no evidence in the record fulfilling the requirements for a *prima facie* case based on job assignments. Plaintiff has not opposed summary judgment on this claim. *Opponent's Responsive Submission in Response to Exhibit D of the Court's Order at* 1.  Therefore summary judgment will be granted as to this claim.

termination, Ms. Clay must prove that similarly situated employees guilty of equivalent offenses were treated less harshly.[13] *Holifield v. Reno*, 115 F.3d 1555, 1555 (11th Cir. 1997). In other words, to prove her *prima facie* case the plaintiff must show: 1) she belongs to a racial minority; 2) she was qualified to do the job; 3) she was subjected to adverse job action; and 4) her employer treated similarly situated employees more favorably. *Id.* at 1555. Forest Manor contests only the second and fourth prongs of this test.

### 1.   MS. CLAY'S QUALIFICATIONS TO DO THE JOB

Forest Manor contends that, because of Ms. Clay's repeated disciplinary problems, she was not qualified to do the job of a CNA. If so, Ms. Clay cannot prove the second prong of her *prima facie* case of racially discriminatory discipline and termination. Plaintiff argues in response that proof of qualifications is not a requirement in a discriminatory discipline or termination claim where the plaintiff has been hired and employed for some time by the defendant. In this regard, the Eleventh Circuit has

> noted that "the McDonnell Douglas test has been modified in cases where a plaintiff was discharged from a previously held position (as opposed to failure to hire or to promote cases)" by deleting the prong requiring proof of qualification. According to the court, "[t]he reason for this modification is that in cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a prima facie case can be inferred." Whether the employee was adequately performing his job would become an issue only if the employer articulated unsatisfactory performance as its reason for discharge.

---

[13]Ms. Clay could also make out a *prima facie* discriminatory termination claim by showing that she was terminated and replaced by someone outside of her protected class. *See, e.g., Nix*, 738 F.2d at 1185. She has not attempted to do so, apparently because the first three CNA's hired after Clay was terminated were black..

*Young v. General Foods Corp.*, 840 F.2d 825, 829 n.3 (11th Cir. 1988) (quoting *Rosenfield v. Wellington Leisure Products, Inc.*, 827 F.2d 1493, 1495 n.2 (11th Cir. 1987)); *see Pace v. Southern Railway System*, 701 F.2d 1383, 1386 n.7 (11th Cir. 1983)(holding that qualification for position can be inferred in cases alleging discharge or demotion where the plaintiff has held the position, but that such an inference is not permissible in hiring or promotion cases where the position sought has not been held previously).

The defendant contends that while an inference of qualification may generally arise, this inference does not apply where "the employer articulated unsatisfactory performance as its reason for discharge." *Young*, 840 F.2d at 829 n.3. The court disagrees that *Young*'s language was intended to rule out the application of the inference in any case involving an allegation of unsatisfactory performance. *Young* indicated generally that "adequate performance would become an issue" in such a case. *Id.* It certainly would. But this does not mean that the qualification prong would be the proper mechanism to deal with this issue. *Young* itself suggested that the pretext stage, not the *prima facie* case stage, would be the proper framework in which to consider poor performance. *Id.* In other words, the plaintiff's case should not be stopped at the qualification prong of the *prima facie* case. Other mechanisms, more finely tuned to this issue, should be used to evaluate claims of poor performance.

The court notes that this reading of *Young* is consistent both with the purposes of the *prima facie* case and with the approach taken by other courts. *See MacDonald v. Eastern Wyoming Mental Health Center*, 942 F.2d 1115 (10th Cir. 1991) (collecting cases); *Boyce v. Newman Memorial County Hospital*, 1992 WL 123692 (D. Kan. 1992) (same). Proof of

plaintiff's failure, in an absolute sense, to perform the job without problems is both too high a hurdle to leap to establish a *prima facie* case and unnecessary for the requisite inference of discrimination. Such an arrangement "'overlooks the role of establishing a prima facie case in the sequence of proof . . . Proof of a prima facie case does no more than entitle the plaintiff to an inference of discrimination; it is not equivalent to a factual finding to that effect.'" *MacDonald*, 942 F.2d at 1120 (quoting *Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 512 (7th Cir. 1986). Such an inference can arise without the need for the plaintiff to prove that they have done their job well. For example, in cases like this one in which the plaintiff sets out to prove discriminatory discipline based on the treatment afforded employees of another race, proof of different treatment for the same offense allows an inference that race, not the offense itself, explains the discipline meted out. The true "focus of the inquiry [is] not a determination of whether [the plaintiff] was in fact performing [her] job adequately, but rather, whether . . . evidence of unsatisfactory performance . . . was the real reason for the termination and not a pretext." *Young*, 840 F.2d at 829 n.3. The qualification prong of the *prima facie* case simply cannot be used to bypass this portion of the inquiry by stopping the case before the question of pretext is reached, nor should the plaintiff be forced to litigate the ultimate question of intent in order to avoid disaster at the *prima facie* stage. Injecting poor performance into the *prima facie* case would short-circuit the entire *McDonnell Douglas* framework.

Thus the court holds that, at least under these circumstances, *Young's* inference should apply and the qualifications prong should be ignored at the *prima facie* stage. The

22

things Mattie Clay allegedly did wrong will be addressed instead under the "similarly situated" prong and again at the pretext stage of the case.

## 2.   SIMILARLY SITUATED EMPLOYEES

The Eleventh Circuit has indicated that, in disciplinary cases, a fairly tight fit is required between the allegedly wrongful acts of the plaintiff and those of the "similarly situated" comparators. "[I]t is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 (11th Cir. 1998). The court has gone so far as to suggest that the offenses committed by the comparators must be "'nearly identical.'"  *Nix*, 738 F.2d at 1185.  Plaintiff's case thus hangs critically on the questions surrounding her preferred comparators - who they are, what they did, and what happened to them.

The court's consideration of these questions is complicated considerably by Forest Manor's relatively loose disciplinary system.  It is clear that the system involves a certain degree of discretion, that different supervisors at different times have varied in both the harshness of the discipline imposed and the formality of the procedures used to apply it, and that the higher level administrators who run Forest Manor are not always aware of each and every disciplinary action which occurs.  The Eleventh Circuit has long recognized that employee discipline is not an exact science, resulting in significant variations in discipline depending on the individual supervisors involved.  Because these differences are explained by personal philosophy, not discrimination, their effects must be weeded out in order to

23

construct a *prima facie* case which raises an "an inference of discrimination." *Holifield*, 115 F.3d at 1562.

The solution is to focus attention on each individual decisionmaker in the disciplinary process. "[D]isciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis." *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989); *see Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1312 (11th Cir.), *modified in other respects,* 151 F.3d 1321 (1998) (noting that when employees are under different supervisors this "may be sufficient to prevent them from being considered 'similarly situated'"). Thus the fact that a supervisor punished Ms. Clay for conduct also engaged in by white employees is not enough to establish a *prima facie* case. The plaintiff must also show that the same supervisor *knew* about the white employees misconduct and took no action.[14] *Jones v. Gerwens*, 874 F.2d 1534, 1541-1542 (11th Cir. 1989) (holding employees were not similarly situated where the decisionmaker was unaware of the violations committed by the white employees). If multiple decisionmakers were involved in disciplining the plaintiff, however, she need only show that one of them knew of violations by white employees and treated those employees differently. "Disparate treatment analysis requires that none of the participants in the decision-making process be influenced by racial bias." *Id.* at 1541 n.13.

---

[14] *Jones v. Bessemer Carraway Medical Center* suggests that a plaintiff may be able to get around this problem by showing that the disciplinary styles of plaintiff's supervisor and the comparator's supervisor were similar. As in *Jones* itself, however, "[p]laintiff . . . cites us to no evidence" establishing such a comparison and the court sees none in the record. *Jones v. Bessemer Carraway Medical Center*, 137 F.3d at 1312 n.7. The record evidence in fact suggests that different supervisors at Forest Manor managed discipline in different ways. *See, e.g., Plaintiff's Exhibit 5 ( Depo. of Jennifer Elmore* at 24).

In this case, a number of supervisors at different levels of the Forest Manor hierarchy were involved in the disciplinary actions which ultimately led to Ms. Clay's termination. A number of lower level supervisors issued the disciplinary warnings which ultimately led to suspension and then termination at the hands of a few higher level supervisors. Ms. Clay could make out a *prima facie* case either by showing that a lower level supervisor did not act even-handedly in issuing one of the critical warnings which led to her termination, *see id.* at 1541-42 (supervisor who recommended discipline was responsible decisionmaker even though final decision was made by higher authority), or by showing that the higher level supervisors involved handled Ms. Clay's accumulated warnings differently than they handled those of other, white employees. Plaintiff's arguments take only this latter tack.[15]

The higher level administrator who figures most prominently in Ms. Clay's story, Seleter Cooper, is the only one who also played a key role in the discipline and ultimate termination of the three comparators.[16] Ms. Cooper, like the other supervisors at Forest Manor, had her own approach to discipline, undermining any comparisons with actions taken by other supervisors. Her unique position as Director of Nursing can also be expected to have influenced her willingness to dole out serious punishment such as

---

[15] Indeed, the court has not located any evidence in the record from which the plaintiff could build a comparison over a particular incident in her disciplinary history. No evidence identifies another employee who committed the same infraction before the same supervisor and was not given an equivalent warning. For example, while Ms. Clay alleges generally that Ms. Elmore treated blacks more harshly than whites, she points to no specific white employee who escaped punishment from Elmore for an offense which Clay herself was punished for.

[16] Leila Quizon, who suspended Clay, was also involved only in the discipline of Emily Swanson. She signed off on Swanson's suspension. However, there is no evidence that Quizon was involved in Swanson's discipline at any other point. Cooper, as Director of Nursing, played a key role in the discipline meted out to all three comparators.

suspension or termination, making any comparison with what lower level managers did, or did not do, even less informative. Thus the court finds it inappropriate to compare the actions, or lack of them, of other supervisors to the decisions about Clay made by Cooper.

In sorting out what happened to each of the comparators, the court must therefore focus on what Cooper knew and what action she took, and determine whether this is different from the way she handled Ms. Clay's situation. Or, to be more precise, the court must determine whether the defendant has borne its burden of showing that plaintiff cannot put the issue of uneven treatment by Cooper in genuine dispute.

### a.    **EMILY SWANSON**

Emily Swanson and Mattie Clay were similarly situated in a number of important respects. Both were CNAs and both received a number of warnings regarding patient care and failure to follow the instructions and policies laid down by their supervisors. Both women were eventually suspended, and both were ultimately fired by Seleter Cooper. The parties' do not really disagree over whether Swanson and Clay were similarly situated. They were, at least to some extent. Instead, the parties' real dispute revolves around the question of whether Swanson and Clay were in fact treated differently.

Because Swanson and Clay both received a number of warnings, at different times, comparing their treatment directly is somewhat difficult. The parties, though working from the same facts, manage to disagree over which of the two women received the harshest discipline. As the defendant points out, Clay received more overall warnings before being terminated. On the other hand, Swanson received more written warnings before she was

26

suspended. Which one got the better treatment? It depends on how you look at the situation.

As the court has already explained, it must view the stories of Ms. Clay and Ms. Swanson from the perspective of Ms. Cooper. She is the only decisionmaker around whom the plaintiff could build a case of disparate treatment, because she participated heavily in the discipline of both women. Thus the question cannot be broken down into a pure numbers game, though both parties have at times attempted to do so. The issue turns instead on what Cooper knew about the disciplinary record of each of the two women, when she knew it, and what she did about it.

To facilitate this discussion, the court will review the stories of Clay and Swanson briefly from Cooper's perspective, keeping in mind that any disputes about what Cooper knew and when must be resolved in favor of the plaintiff. Viewed in the light most favorable to Clay, the evidence suggests that Cooper was unaware of any of Clay's infractions until Quizon and Cooper suspended Clay in February of 1996. Because only the three warnings issued on January 29 and 30 were discussed at the suspension meeting, and only these warnings were attached to the suspension, a factfinder could reasonably infer that Cooper knew about only these three warnings. The court should also note that it is not clear whether these warnings were intended to be verbal or written, so for summary judgment purposes they will be classified as verbal. Thus at this stage the court will assume that Cooper approved the suspension of Clay based on three verbal warnings. The undisputed facts reveal that Cooper then terminated Clay for the next violation of any kind of which Cooper was aware.

27

Cooper also terminated Swanson for the first violation occurring after Swanson returned from suspension. Plaintiff's claim of differential treatment is thus based not on the termination itself, but on the argument that Swanson was given more warnings than Clay before she was suspended.  Viewing the situation from Cooper's perspective, the watershed date was March 20, 1996.  On this day, Cooper issued two written warnings to Swanson.[17]  Swanson had already received two prior warnings, one verbal, one written.  If Cooper knew that Swanson had received these warnings, the situation would have been very similar to that surrounding Clay's suspension.  Three warnings for Clay, two on the same day, led to suspension.  Four for Swanson, two on the same day, should have led to suspension as well.  Instead, Cooper indicated that Swanson would be suspended for the *next* offense, as indeed she was  Thus if Cooper knew about the prior warnings, she treated Swanson differently than Clay.

Unfortunately, it is not clear whether Cooper knew about the prior warnings when she issued her own on March 20 or not.[18]  Neither Cooper's deposition nor her affidavit makes this clear.  In fact, in her deposition Cooper repeatedly indicated that she was not "aware of those," pointing out some of Swanson's warnings.   *See Plaintiff's Exhibit 3* (*Depo. of Seleter Cooper at* 139-40). However, the record does not show which warnings Cooper was pointing at.  Thus, on the paper record before the court on summary judgment,

---

[17]The other, verbal warning issued on March 20, 1998 is not relevant to this discussion because Cooper did not know about it.

[18]If she didn't, then Cooper was faced only with two written warnings on the same day.  While an argument could be made that two written should be the same as three verbal, the court suspects that in such a case it simply could not make the comparison at all and would have to hold that Swanson and Clay were not similarly situated.  Apples and oranges cannot be compared, which is precisely the reason why the similarly situated prong of the test is so important.

the court cannot say for sure that Swanson was not given more opportunities to correct her behavior than Clay before being suspended. *Plaintiff's Exhibit 3* (*Depo. of Seleter Cooper at* 142) (stating that Swanson was "possibly" given more chances). Therefore it will assume, though it has its doubts, that the plaintiff could prove a one-warning difference at trial.

However, this slight difference is simply too thin a thread on which to hang an entire racial discrimination claim, particularly since that thread may come unraveled at trial once Ms. Cooper clarifies her testimony about what she knew on March 20. The court suspects, based on Ms. Clay's history, that giving her a few additional chances would not have kept her at Forest Manor much longer. Both Clay and Swanson were ultimately fired, and if the case is viewed from a practical perspective[19] this is the only important thing. The selection of comparators is not an exact science. Just as here, the circumstances two people find themselves in are never identical, so courts cannot expect mathematically identical treatment either. Some degree of discretion is required to determine whether the situations are similar enough, and the treatment different enough, that the comparison is sufficient to raise the required "inference of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). Courts must therefore have some flexibility in crafting and applying the *prima facie* to ensure that proof of these elements means something. This is precisely why the court has some discretion in determining which employees are similarly situated to the

---

[19]Of course, as Judge Fay has recently pointed out, it is "always dangerous to inject" considerations of practicality and common sense "into judicial proceedings." *Allen v. Thomas*, 1998 WL 812366, at *8 (11th Cir.). However, in this case the court is willing to take that risk, especially as it has found no authority directly addressing the question.

plaintiff. *See Jones v. Bessemer Carraway Medical Center*, 137 F.3d at 1311.  Courts must likewise have some room to determine whether a similarly situated individual was treated differently in any significant sense.  Here, the court finds that Emily Swanson was not.

Therefore the court holds that, at least on the record as presented on summary judgment, Emily Swanson was not a similarly situated employee who was treated differently.

### b.    TRACY TAYLOR

The other two comparators are even less helpful to the plaintiff.  Tracy Taylor's disciplinary history boils down to a number of problems with absences and one patient care warning, issued on April 27, 1996.  It is undisputed that at the time she reviewed this warning Seleter Cooper was unaware of Taylor's record (other than one excused absence).  She nonetheless noted on the April 27 write-up that any further problems would result in suspension.  A few weeks later, on May 10, 1996 Ms. Taylor missed work without calling in.  Ms. Cooper formally terminated her.

The court has difficulty understanding how this treatment, even if Ms. Taylor's absences were considered similar to Ms. Clay's patient care violations,[20] could possibly be considered better than that afforded Clay.  Cooper, the only supervisor involved in both the suspension and termination of Clay and the discipline of Taylor, threatened Taylor with suspension after the first warning she knew of and fired her the next time a problem arose.  Clay got several more chances than this.  As best the court can tell, the plaintiff's argument boils down to a claim that because a different supervisor (not Cooper) failed to properly

---

[20]Which they almost certainly should not be. *See Jones v. Bessemer Carraway Medical Center*, 137 F.3d at 1311-12 (affirming this court's refusal to compare attendance violations with insubordination).

discipline Taylor for a different problem (attendance) under a different set of disciplinary policies, the fact that Clay was punished for her violations[21] should be sufficient to support a *prima facie* case of discrimination. It is not.

Taylor is similarly situated to Clay in only one respect - - she received a warning on April 27, 1996 for poor patient care - - and in that regard she was treated by Cooper in a manner entirely consistent with both Clay's experiences and Forest Manor's policy. How other supervisors may have handled previous problems of a different type, for example Taylor's absences, is simply irrelevant. *See Jones v. Gerwens*, 874 F.2d at 1541; *Jones v. Bessemer Carraway Medical Center*, 137 F.3d at 1311-12 (affirming this court's refusal to compare attendance violations with insubordination and noting the involvement of different supervisors "may be sufficient to prevent [employees] from being considered 'similarly situated'").

The court notes that the outcome of the parties' argument over whether Taylor technically quit or was fired[22] does not affect this analysis in the slightest. The key question is whether Cooper ever faced a situation where, consistently with Clay's treatment, she should have fired Taylor, and she did not. If Cooper fired Taylor on May 13, 1998, she took the first opportunity she knew of to do so. If Taylor quit, Cooper just never got the chance. Either way, Cooper did nothing inconsistent with the way she handled Clay's situation.

---

[21] The court notes that Clay herself got substantially more chances than Forest Manor's policy would allow, if strictly applied.

[22] *See supra* note 9.

c.    **KEMM HENLEY**

The parties agree that prior to Ms. Henley's termination on February 21, 1996, Ms. Cooper was unaware of the numerous warnings which had been issued to Ms. Henley. *Opponent's Response to Movant's Statement of Facts* No. 83.   The fact that other supervisors had let Ms. Henley slip by with warnings when she should have been terminated does not suggest that Ms. Clay's termination was discriminatory. As soon as Cooper, the only supervisor involved in Clay's suspension and termination who also was responsible for Henley, learned of the situation Henley was terminated immediately.  This establishes only that Cooper enforced Forest Manor policy more vigorously than some of the lower level supervisors.  It raises no inference of discrimination.  The court therefore concludes that Henley's situation cannot properly be compared to Clay's.   *See Jones v. Gerwens*, 874 F.2d at 1541; *Jones v. Bessemer Carraway Medical Center*, 137 F.3d at 1312.

The court also notes that, except for one incident, the complaints about Henley all revolve around either medication and recording errors or attendance.  These violations are significantly different in nature from the patient care and insubordination charges leveled against Clay, and were apparently handled under a completely different set of disciplinary rules at Forest Manor.   The fact that different violations may be treated differently is not at all unexpected, and such a situation does not suggest discrimination.  Henley simply cannot serve as a proper comparator under these circumstances.   *See Jones v. Bessemer Carraway Medical Center*, 137 F.3d at 1311-12 ( attendance violations and medication errors not comparable to insubordination).

32

### 3.    **PRETEXT**

The defendant has presented strong evidence that it had good reasons to want rid of Mattie Clay.  The relatively minor differences between the disciplinary histories of Clay and Swanson is not enough to cast those reasons into doubt.  Nothing else in the record suggests that Forest Manor's disciplinary actions were motivated by anything besides Clay's misdeeds.  To avoid summary judgment on the pretext issue, plaintiff must "produc[e] sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable." *Howard*, 32 F.3d at 526.  She has not done so.

Because defendant has shown that the plaintiff cannot bear her burden of proof on either the *prima facie* case or pretext requirements of her racially discriminatory discipline and termination claims, summary judgment will be granted as to those claims.

### B.    **Retaliation Claim.**

The defendant also seeks summary judgment on Ms. Clay's retaliation claim[23] based upon its contentions that Ms. Clay cannot sustain her *prima facie* case or prove pretext.  In order to make out a prima facie case of retaliation, Ms. Clay must show (1) that she was engaged in statutorily protected expression, (2) that Forest Manor took adverse employment action against her, and (3) a causal link between the protected expression and the adverse action. *Lindsey v. Mississippi Research and Dev. Ctr.*, 652 F.2d 488, 491 (5th Cir. 1981). The defendant argues that Ms. Clay cannot establish either the first or the third

---

[23] Title VII protects employees from discrimination by their employer "because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any matter in an investigation, proceeding, or hearing under this title." 42 U.S.C. § 2000e-3.

33

elements of her retaliation claim.  Forest Manor concedes that it took adverse action against Clay.

### 1.    PROTECTED ACTIVITY

Title VII makes it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge . . . or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a). Section 2000e-3 protects both opposition and participation.  Plaintiff claims that she was retaliated against in violation of the "opposition" clause.

The protection of the opposition clause reaches beyond formal complaints to the EEOC.  Protected activities include even informal complaints to an employer. *See Rollins v. State of Fla. Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989).  However, not every complaint about racial bias is covered under the clause.  The complaint must relate to a "practice made an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e-3(a). "'[B]y the terms of the statute . . . not every act by an employee in opposition to racial discrimination is protected.  The opposition must be directed at an unlawful employment practice of an employer.'" *Little v. United Technologies*, 103 F.3d 956, 959 (11th Cir. 1997) (quoting *Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir. 1978)).

Plaintiff's complaint of retaliation is based on the letter she wrote and passed on to Seleter Cooper and others complaining about Jennifer Elmore's conduct.  Forest Manor contends that this letter did not constitute "protected activity," and in support of its argument cites this court to a Sixth Circuit case, *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d

34

1304 (6th Cir. 1989), and a Third Circuit case, *Barber v. CSX Distribution Services*, 68 F.3d 694 (3d Cir. 1995).   In the court's view, *Barber* establishes only that to be protected a complaint must actually refer to discrimination. *See id.* at 702 ("It is clear from Barber's letter that he felt that he had been treated unfairly . . . .   However, the letter does not explicitly or implicitly allege that [race] was the reason for the alleged unfairness.").   No one disputes this proposition, and the direct racial references in Clay's letter clearly satisfy this requirement.

*Booker*, however, does advocate a broader rule.   In *Booker*, the Sixth Circuit, addressing Michigan state law, determined that a letter from the plaintiff to the employer's human resources department was not "protected activity."   The letter "attacked and attempted to blame all of [the plaintiff's] problems on his supervisor." *Id*. at 1309.   In the letter, the plaintiff wrote that his supervisor had said, "I don't know if these people," referring to African-Americans, "can comprehend asset management." *Id*.   The plaintiff also stated that "this is a case of ethnocism."[24]

The court concluded that the state statute was to be construed in the same manner as 42 U.S.C. § 2000e-3, the Title VII section prohibiting retaliation.   The court noted:

> An examination of the letter indicates that it is not in opposition to a violation of the Act.   Booker was not contesting any unlawful employment practice; he was contesting the correctness of a decision made by his employer.   Booker generally attempts to dispute the employer's position with regard to his managerial style, and he suggests that the focus of the company's inquiry should be on his supervisor . . . .

---

[24]The court notes, for the curious, that the *Booker* court concluded that "ethnocism" is not a word.   What plaintiff meant by this usage was apparently never determined.

There are only two possible allegations in the letter that suggest Booker may have been contesting an unlawful employment practice. Booker suggests that [his supervisor] may be racist due to a statement he allegedly made. However, *the allegation is not that Brown & Williamson is engaging in unlawful employment practice, but that one of its employees has a racial intolerance.*

*Id.* at 1313 (emphasis added).  The court went on to hold that "[a] vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice." *Booker*, 879 F.2d at 1313.  Because plaintiff's letter is, admittedly, somewhat vague, defendant argues that this rule takes the letter outside the realm of protected expression.

This court, of course, must follow the path marked out by the Eleventh Circuit. Viewed in the light of the Eleventh Circuit's case law, the court concludes that the *Booker* rule is correct, to a point.  Eleventh Circuit precedent indicates that the protected activity inquiry revolves around *what* the plaintiff is complaining about, not the manner in which the complaint is made.  Thus

> a plaintiff can establish a prima facie case of retaliation under the opposition clause of Title VII if he shows that he had a good faith, reasonable belief that the employer engaged in unlawful employment practices.  It is critical to emphasize that a plaintiff's burden under this standard has both a subjective and an objective component.  A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented.  It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

*Little v. United Technologies*, 103 F.3d 956, 960 (11th Cir. 1997).  However, this belief can be conveyed to the employer in virtually any form.  *See Rollins v. State of Fla. Dep't of Law*

*Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989). What is important is simply that the employer gets the message. The causation prong of the Eleventh Circuit's *prima facie* case requires "at least . . . that the employer was actually aware of the protected expression at the time the employer took adverse employment action against the plaintiff." *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997). While the Eleventh Circuit has never spoken directly on the point, the court suspects that "implicit in the requirement that the employer have been aware of the protected activity" and in *Little*'s logic "is the requirement that [the employer] understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Galdieri-Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998). Without this knowledge, the employer couldn't know it was protected activity at all.

These principles suggest that a discrimination complaint may, under some circumstances, be so vague that it will not constitute protected activity. A plaintiff who is complaining in a vague way about discrimination may not convey the message that a particular unlawful discriminatory practice is being complained about. Indeed, the plaintiff's own conception of what is wrong may be so hazy that she herself never subjectively focuses on a practice which is actually illegal. Either way, the complaint would not be protected. Nor should it be, for if it were any employee fearing for her job could put up a roadblock in the way of termination by making a meaningless generic charge of discrimination. This is not the purpose for which the opposition clause was created.

However, Title VII does not leave an employee who makes a real complaint about possible discrimination unprotected merely because the complaint is poorly written or

37

vague. In determining protection under the opposition clause, the real questions are whether the complaint was in fact directed against a particular unlawful practice, and whether it could reasonably be read that way. If so, the Eleventh Circuit's requirements are satisfied. Linguistic precision is not and should not be required.

While the court cannot be sure, it suspects that the Sixth Circuit did not mean to suggest any more than this when it attacked "vague" charges of discrimination in *Booker.* That case likely yielded the result it did because the court found only a generic mention of racism, without reference to a particular unlawful practice, in the complaint at issue. The allegation in that case was "not that Brown & Williamson is engaging in unlawful employment practice, but that one of its employees has a racial intolerance." *Booker*, 879 F.2d at 1313. As the Eleventh Circuit has observed, such a charge is not protected because what it complains about is not illegal. "The opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual.'" *Little*, 103 F.3d at 959. *Booker*'s result is thus entirely consistent with this circuit's case law, and with this court's interpretation of that precedent.

In this court's view, then, the determinative question in this case is not whether Clay's letter is like the letter in *Booker* because it is vague. The question is whether it is like the letter in *Booker* because it does not refer to unlawful discrimination at all.

Because *Little*'s test is in part a subjective one, the court must begin this inquiry by asking what Mattie Clay meant to complain about when she wrote the letter. Neither party has focused attention on this question, and both seem to discuss Clay's letter in the context of the warning issued by Elmore. Ms. Clay contends that her letter describes

38

discriminatory "discipline" by Ms. Elmore. Plaintiff makes much of the Supreme Court's recent pronouncements that when supervisors make "'tangible employment decisions'" with "'tangible results, like hiring [and] firing'" on discriminatory grounds such actions can be imputed to the employer and constitute Title VII violations. *See Opponent's Responsive Submission in Response to Exhibit D of the Court's Order* at 10 & n.2 (quoting *Burlington Industries, Inc. v. Ellerth*, 118 S. Ct. 2257, 2269 (1998) and *Faragher v. City of Boca Raton*, 118 S. Ct. 2275, 2284-85 (1998)). For its part, Forest Manor also appears to assume that the complaint involves Elmore's warning, arguing that there is no basis for an objectively reasonable belief that Elmore treated Clay differently because Elmore also issued a warning to a white employee on the same day. *See Defendant's Reply Submission in Response to Exhibit D of the Court's Order* at 8.

These arguments overlook a crucial undisputed fact. In her deposition, Clay indicated that at the time she wrote the letter *she did not know that Elmore was going to write her up.* In fact, Clay testified that she thought the matter was concluded once Elmore yelled at her. Thus Clay's testimony indicates that what she was complaining about was not tangible discipline in the form of a warning which led to termination. She was complaining about the yelling. The language of the letter itself bears this out. Clay wrote

> I came up the hall and came to [sic] desk to see what she wanted. *Jennifer then went to hallowing [sic] and stomping her feet at me like I was her child.* Jennifer say [sic] I have to tell you everyday to take Mr. Beauchamp to [sic] Dining room. Mr. Beauchamp was already in the Dining room. Jennifer was not telling the truth, she never said anything to me about Mr. Beauchamp anyway. . . . Jennifer told Wanda not to take Mr. Beauchamp to the Dining room to let me take him to *have something to fuss with me about.*
>
> Jennifer Elmore does not know how to talk to anybody. Her attitude is out of this world. . . .

39

Mr. Beauchamp was in the Dining room when Jennifer started this mess, she just did it to have something to get at me about. *Jennifer is always picking at me . . . .*

One time before Jennifer came in the room hollowing [sic] at me . . . . She was not telling the truth about this. . . . Jennifer did not apologize for that.

I am not a child, in fact, I am older than Jennifer and she need [sic] to learn how to talk to people. *Just because I am black that don't [sic] mean she have to talk to me like a dog.* Matter of fact, you don't talk to a dog the way she be [sic] talking to me. . . .

Remember to do unto others as you would have them to do unto you. Jennifer Elmore is an [sic] LPN and *she need [sic] to have the ability to get along with others* and change her attitude. *She do [sic] wrong and then she be [sic] running up in black folk face grinning about it.*

*Plaintiff's Exhibit 17 (emphasis added).* No mention of a warning or any other type of tangible discipline appears in this letter, just as one would expect given Clay's testimony that she wasn't told about the warning. Instead Clay's letter appears to refer to her claim, which she reiterated throughout her deposition and which her co-employees also expressed in their affidavits, that Elmore spoke harshly to the employees she supervised, and in particular to blacks. On the record before it, the court therefore concludes that this problem is what Clay was talking about in her letter.

The court must therefore ask whether, given the available evidence, Clay could reasonably have believed that what she complained of was actually happening and that it was unlawful under Title VII. The best answer the court can give at this point is "maybe." What Clay's letter complains about is probably not tangible job discipline at all. It is far more akin to racial harassment. Racial hostile environment claims, like those based on sex, do not need to involve tangible job decisions. Instead, the overall effect of harassment on the work environment can be so pronounced as to be itself tangible, thus allowing a

40

cognizable claim under Title VII. However, the harassment must be "'sufficiently severe and pervasive to alter the conditions of the victim's employment'" and create "an objectively abusive and hostile atmosphere." *See Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir. 1995) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993)). This is a complex factual assessment, involving a number of factors. However, the court is sure that if a supervisor yelled at some employees and treated others with courtesy based on race, at some point this would be bad enough to constitute racial harassment. Where the line would be, and whether the facts in this case come close to crossing it, is a harder question, however.

The court has very little evidence, and no argument, before it to allow it to determine whether the conduct Ms. Clay described was bad enough to come sufficiently close to the hostile environment standard. The court does know that it cannot duck the question by making a common-sense assessment from the perspective of an ordinary person unfamiliar with the law. Instead, the belief that this conduct was actually unlawful under Title VII must be reasonable in the eyes of an objective observer "charge[d] . . . with substantive knowledge of the law." *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1388 n.2 (11th Cir. 1998). Thus where a complaint alleges racial harassment, the conduct involved must come close to the high standard the law sets for a hostile environment before the complaint will be a protected activity. *Clover v. Total Systems Servs.*, 157 F.3d 824 (11th Cir. 1998).

The court frankly suspects that, when all the facts are in, plaintiff may not be able to meet this standard. However the court cannot tell for sure at this point. The defendant has

41

failed to carry its initial burden on this issue, not surprisingly as the issue was never addressed. Therefore, for the time being, the protected activity prong is not fatal to plaintiff's *prima facie* case.

### 2.    **CAUSATION AND PRETEXT**

To satisfy the third element of her prima facie case of retaliation, Mr. Harris must show a causal connection between the protected expression and the adverse employment action. In the Eleventh Circuit, this requirement is interpreted broadly; "a plaintiff merely has to prove the protected activity and the negative employment action are not completely unrelated." *EEOC v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1991). The timing of an action alone may be almost sufficient to satisfy this standard. *See id.* at 1572 ("the cumulative effect of these actions and their timing . . . was sufficient to meet the plaintiff's initial burden."); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1164 (11th Cir. 1993) ("[E]vidence that [the] employer knew of employees's protected activities, *combined with a proximity in time between protected action and the allegedly retaliatory action*, is sufficient to establish a prima facie case of retaliation.") (citing *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987)) (emphasis added); *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600-01 (11th Cir. 1986). In this case, according to the plaintiff Cooper received her letter and fired her on the same day. Under ordinary circumstances, this would be more than enough to raise an inference of retaliation and satisfy the *prima facie* element of causation. However, the situation in this case is complicated by the fact that Cooper received, on the same day, a warning which under Forest Manor's disciplinary policy merited termination.

42

Thus Cooper had before her the day she terminated Clay both a wrongful reason to fire the plaintiff and a perfectly good one.

To suggest that her letter was the reason for termination Clay points to the timing of events on that fateful day, April 29, 1996. Under Clay's version of events, when she presented the letter to Cooper and others on the morning of the twenty-ninth no mention was made of the warning Clay had received or the possibility of termination. It wasn't until near the end of the day that Clay was told she was being terminated. Clay argues that a jury could infer from this that the decision to terminate her was not made until *after* Cooper saw the letter, thus raising an inference of retaliation.[25] For her part, Cooper cannot remember when the critical termination decision was made. The court agrees that under the circumstances a reasonable jury could certainly believe that Cooper had both the letter and the warning in hand when she made the decision to terminate Clay.

The question for the court, then, is whether plaintiff can establish the causation element of her *prima facie* case by proving that her employer had both a new, legitimate reason for termination, never dealt with previously, and a complaint protected under Title VII, never before seen, in hand when an adverse employment decision was made. As already discussed, the Eleventh Circuit has indicated that an adverse action taken soon after a protected complaint is filed may raise an inference of retaliation. On the other hand, as Judge Propst of this court has pointed out, "the expiration of a short time alone can create

---

[25] Clay also suggests that Cooper's explanation for waiting until the end of the day - - that she wanted Clay to be able to ride home with a co-employee at the end of the shift - - is not believable. While the court also finds this explanation somewhat curious, the court notes that plaintiff claims that she presented Cooper with the letter in the morning. Thus even if the decision to terminate was made based on the letter, this does not explain why Cooper waited until the end of the day to take action. Cooper's delay, while a little odd, thus does not support plaintiff's version of events any more than it does the defendant's.

43

an inference of a causal link" only if "there [is] no . . . intervening factor between the charge of discrimination and discharge." *Booth v. Birmingham News*, 704 F. Supp. 213, 215 (N.D. Ala. 1988). The presence of an intervening event breaks the causal chain and dissipates the inference of discrimination.

What happened here isn't exactly an intervening event, however. It appears that Cooper was faced with both the protected complaint and the new warning at about the same time. The court is aware of no decision which has dealt with exactly the problem faced here - - the virtually simultaneous presentation of a legitimate reason for termination and a protected complaint, so that both were freshly before the employer when the decision was made. In this court's view, such a situation demands resolution by a trier of fact. The Eleventh Circuit has pointed out that, as a matter of common sense, proximity in time allows a reasonable factfinder to infer that two events are related. In a case like this one, a jury could reasonably infer that the decisionmaker acted based on *either one* of the two new pieces of information before her. The presence of two possibilities certainly gives the factfinder an option other than retaliation, but it does not negate a reasonable inference in favor of retaliation. Particularly in light of the Eleventh Circuit's instruction that the causation prong of a retaliation *prima facie* case is meant to be a low hurdle for the plaintiff to jump, *see Reichhold Chemicals*, 988 F.2d at 1571-72, the court concludes that the existence of this reasonable inference is enough to satisfy this element of the *prima facie* case. Because the jury could reasonably choose either option, it must be given a chance to make the choice.

The court must reject defendant's argument that the plaintiff cannot prove pretext for the same reason. A reasonable jury, reviewing the events of April 29, could infer form the

44

timing of events that Clay's letter played a role in her termination.  The court notes also that, if Ms. Clay's testimony concerning Ms. Brown's reaction to the letter is true, Brown's emotional reaction also weighs in favor of an inference of retaliation.  Therefore the court concludes that the defendant has failed to carry its burden of negating the causation and pretext elements of plaintiffs retaliation claim, and summary judgment is due to be denied as to this claim.

## V.    CONCLUSION.

The defendants' motion for summary judgment will be granted in part and denied in part. The court will enter an appropriate order in conformity with this memorandum opinion.

Done, this _22nd_ day of September, 1998.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE